IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID BIXBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10 C 405 |
| v. | ) | |
| | ) | The Honorable William J. Hibbler |
| JP MORGAN CHASE BANK, N.A. and | ) | |
| JP MORGAN CHASE & CO. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

David Bixby sued his former employer, JP Morgan Chase Bank, N.A. (Chase)[1], alleging that

it failed to offer him a reasonable accommodation for his disability, discriminated against him on

the basis of his disability, and retaliated against him for protesting that discrimination. Both parties

move for summary judgment.

### I. Factual Background

Neither party's memoranda of law in support of or opposition to the motions for summary

judgment contain a statement of facts. Courts in this district have repeatedly informed litigants that

a Local Rule 56.1 statement of facts is not a substitute for a statement of facts contained in a

memorandum of law. *See, e.g., Courtney v. Chicago Police Dept.*, No. 10 C 2782, 2011 WL

---

[1] Bixby has sued both JP Morgan Chase Bank, N.A., his employer, and JP Morgan Chase
& Co., its parent company. The parties agree that JP Morgan Chase & Co. was not Bixby's
employer. Bixby makes no argument that JP Morgan Chase & Co. should be liable for the acts
of its subsidiary. Accordingly, the Court grants JP Morgan Chase & Co.'s motion for summary
judgment and refers only to JP Morgan Chase Bank, N.A.

1

1118874, at \*3 (N.D. Ill. Mar. 24, 2011); *Cleveland v. Prairie State College*, 208 F. Supp. 2d 967, 972-73 (N.D. Ill. 2002). Omitting a narrative statement of facts from a brief allows a party to circumvent the 15-page limit on briefs imposed by Local Rule 7.1. *See RJB Prop. Inc. v. Bd. of Educ. of City of Chicago*, No. 04 C 5226, 2006 WL 224101, at \*1 (N.D. Ill. Jan. 24, 2006). More importantly, omitting a narrative statement of facts makes the Court's task in organizing and setting forth the undisputed facts significantly more difficult and time consuming.

To make matters worse, the parties' 56.1 Statements are unnaturally long-winded. Many of the proposed undisputed statements of fact are lengthy paragraphs containing numerous facts. Local Rule 56.1 requires "short" paragraphs. L.R. 56.1. The statement in support of Chase's motion contains 80 numbered paragraphs and is 34 pages long (averaging roughly 2 statements of fact per page). Bixby's response utilizes minuscule font to compress 40 additional statements into 13 pages. Moreover, the parties' objections to their opponents' statements are even more verbose. Bixby's objections are compressed into 34 pages of single-spaced pages again utilizing minuscule font. Chase's objections to 40 paragraphs take 52 pages. The statements in support of Bixby's motion are just as long winded, totaling 108 pages.

The reason for the long-windedness is principally because the parties dispute nearly every fact, even those that are not in dispute. In addition, the parties' 56.1 materials contain page after page of impermissible argument.[2] For example, in some of its statements of fact, Chase quotes verbatim from the letters exchanged by its medical professionals and Bixby's treating professionals. Somehow, however, Bixby believes these facts are "disputed." *See, e..g.,* Pl. 56.1(b)(3)((B) St. ¶ 64.

---

[2] Ironically, Chase moves to strike Bixby's statement of facts on this ground, ignoring the fact that its own statement is filled with just as much impermissible matter.

2

But the documents state what they state and Bixby offers no legitimate reason for disputing Chase's statements of fact quoting from those letters. Other times, Bixby disputes statements of fact setting forth the opinions of Chase's medical professionals. *See, e.g.,* Pl. 56.1(b)(3)(B) St. ¶ 61. But Bixby does not dispute that Chase's medical professionals *had* such opinions, he disputes that they are valid and his response is argumentative and improper. Finally, Bixby frequently disputes statements merely to be cantankerous. *See, e.g.,* Pl. 56.1(b)(3)(B) St. ¶ 8 (disputing statement on the grounds that material cited does not support the statement where deposition testimony clearly supports the statement (James Dep. 89-90; Williams Dep. 43-45)).

For its part, Chase disputes nearly every statement offered by Bixby on no more reasonable grounds. For example, Chase objects to some of Bixby's statements of fact, arguing that they are supported only by "self-serving" affidavits. *See, e.g.,* Def. 56.1(a) Reply ¶ 8. Of course, most affidavits are self-serving, but that does not provide a basis to disregard them. *Kaba v. Stepp*, 458 F.3d 678. 681 (7th Cir. 2006). Indeed, Chase itself submits five self-serving affidavits upon which it would have the Court rely. Chase also suggests, without explanation, that Bixby's affidavits lacks foundation. Bixby, however, avers that the statements in his affidavit are based on personal knowledge and even details the basis of that knowledge in the affidavits. Like Bixby, Chase uses its reply to his statements of fact to present argument. For example, in response to Paragraph 8 of Bixby's Additional Facts, Chase argues about the weight of the evidence cited by Bixby, complaining that the deponent was not Bixby's manager after May 13, 2008 and did not know what Bixby was doing after that date. Chase does not point to facts that demonstrate that the responsibilities of a Project Manager changed after May 2008. In fact, Chase *itself* relies on testimony from the same deponent to describe Bixby's job duties. (Def. St. ¶ 3). Chase cannot pick

3

and chose which portions of a deponent's testimony that it believes are most favorable to its argument and then argue the rest should be disregarded.

The parties even contest facts that are not material. For example the parties dispute which project was temporarily removed from Bixby's job responsibilities by his manager when he first asked for a reduced workload without explaining why it matters whether one project or another was removed from Bixby's job responsibilities. *See, e.g.*, Def. St. ¶ 10; Pl. 56.1(b)(3)(B) St. ¶ 10.

The parties willingness to turn a straight-forward employment discrimination case into a sea of paper wastes both the Court's time and the clients' resources. There is little reason for a party to engage in sleights of hand in order to comply with the Local Rules. Nor is there reason to engage in mental gymnastics and nit pick every statement or phrase, often, it seems, merely for the sake of raising a "dispute." Such obstinance does not advance either party's position.

The Court was reluctant even to issue this Memorandum Opinion and Order and instead strongly considered striking any and all summary judgment materials without prejudice and requiring the parties to resubmit their materials. To do so, however, would have been to punish the clients, Bixby and Chase, in delaying the resolution of this suit.

As a consequence, however, for counsel's wholesale failure to comply with the Local Rules the Court orders that no charge be made to any client for costs associated with compiling the summary judgment materials. This consequence includes costs which may be taxed at the conclusion of the litigation. Further, the Court makes clear to both counsel that in the future if it receives summary judgment materials from them or any in their firm that are similar to these summary judgment materials it will strike any and all such material and make its ruling on the basis of the material that remains.

In November 2006, Chase hired Bixby to work as a Project Manager in its Onboarding Department. (Def. St. ¶ 3; Pl St. Add'l ¶ 8). Neither party, however, truly describes what the Onboarding Department did. Chase offers only a jargon-filled, circular definition of the Onboarding Department, stating that the "Onboarding Department is responsible for implementing a standardized and consistent client onboarding approach, designed to deliver a best-in-class client experience." (Def. St. ¶ 3).[3] Bixby, on the other hand, offers no description of the Onboarding Department whatsoever.

Similarly, neither party truly describes the duties of a Project Manager. Chase provides a list of Bixby's job responsibilities, but it too is circular and vague. (Def. St. ¶ 3). In addition, Chase refers to the Project Manager's job description, but this description also is vague. (Def. Ex. N at Tab 2). During his deposition, Bixby, in an evasive effort to avoid being pinned down, states only that his duties vary based on the project. (Bixby Dep. 43-49). In an affidavit, Bixby states that a Project Manager "coordinated new software features and software updates." (Pl. St. Add'l ¶ 8). Finally, one of Bixby's supervisors at Chase, Program Manager Phillip Nassos, testified that Bixby's most of Bixby's job duties included reading, e-mailing, participating in meetings (often via conference call),

_____

[3] At best, Chase's description of the Onboarding Department is circular. Stating that the "onboarding department" is responsible for developing an "client onboarding appraoch" is not helpful in defining what "onboarding" means. Indeed, typically, "onboarding" refers to the process by which *employees* gain institutional knowledge and skills to become effective employees. Clearly, that is not what Chase means by "onboarding" as it refers to its clients. Perhaps the Onboarding Department is that division which creates interfaces, such as loan applications or software products, that bring clients or customers to Chase, but to so conclude would be speculation on the Court's part. In addition, Chase's circular definition of the "Onboarding Department" contains an unnecessary and wholly superfluous pat on the back. Whether Chase's clients have a better "onboarding experience" than Bank of America's clients is not relevant in any way and only further obfuscates the true function of Chase's Onboarding Department.

5

and working on his computer. (Pl St. Add'l ¶ 8). So, Bixby worked as a project manager managing projects in the Onboarding Department, which was responsible for the client onboarding experience. Unfortunately, because of the parties' mutual desire to obfuscate, the Court can be no more specific or precise.

When Bixby began working for Chase, Nassos was Bixby's direct supervisor in the Onboarding Department. (Def. St. ¶ 4). Nassos was supervised by Patricia Cronin. (Def. St. ¶ 4). Nassos gave Bixby an "Exceeds Expectations" on his 2007 year-end review. (Def. St. ¶ 4). In February 2008, however, Chase's CEO replaced Cronin with Brian James, who had previously held the same job title as Nassos. (Def. St. ¶ 6).

In April 2008, James reorganized the Onboarding Department, reducing Nassos's responsibility. (Def. St. ¶ 7). In addition, James brought Shawn Williams to the Onboarding Department as a Program Manager. (Def. St. ¶ 6). As part of the change, Bixby was assigned to manage the "APS Migrations" project and to share the "Enterprise Releases" project with another Project Manager. On April 21, the team working on APS Liquidity Migration had a meeting scheduled in Tampa. (Def. St. ¶ 8). As the team leader, Bixby was to facilitate that meeting. (Def. St. ¶ 8). According to Bixby, Nassos had excused him from the meeting. (Bixby Dep. 66).

The next day, Bixby was hospitalized for a panic attack. (Def. St. ¶ 8). A few days later, Bixby asked Nassos to reduce his workload and allow him to work from home. (Def. St. ¶ 9). Nassos granted Bixby's requests, allowing him to work from home and temporarily reducing Bixby's workload. (Def. St. ¶ 10).

In May 2008, Williams became Bixby's direct supervisor. (Def. St. ¶ 10). Shortly thereafter, Williams solicited feedback from Bixby's peers and team members about his

6

performance. (Def. St. ¶ 13). Williams asked Bixby's peers and team members whether he "reached out" to them on a regular basis, to which many responded that he did not. (Def. St. ¶ 13). Williams phoned Bixby to discuss the critical comments. (Def. St. ¶ 14). Although Bixby disagreed with the criticism presented by Williams, Bixby told Williams that he would accept the removal of APS Migration from his responsibility if Williams believe that was the best course of action. (Bixby Dep. at 100-101).

A few days later, Bixby wrote Williams an e-mail to provide feedback regarding the meeting. (Def. St. ¶ 15; Bixby Dep. Ex. 6). In the e-mail, Bixby indicated a willingness to respond to Williams's concerns about his performance. (Bixby Dep. Ex. 6). Bixby requested that he and Williams have an ongoing and open conversation about his performance so that Bixby could meet Williams's expectations. (Bixby Dep. Ex. 6). In addition, Bixby identified five areas in which he would focus his effort to improve his performance, including increasing his communication with peers and team members and Williams. (Bixby Dep. Ex. 6). Williams responded to Bixby's e-mail, noting that he wanted Bixby to succeed but warning him that his performance had not met his or James's expectations. (Bixby Dep. Ex. 6). Williams warned Bixby that unless his performance improved he would be rated as a "Needs Improvement" at his mid-year review. (Bixby Dep. Ex. 6).

Shortly after this e-mail exchange, Williams expected Bixby to attend a meeting in Columbus, Ohio for a project he was supervising. (Williams Dep. 240-43). Bixby, however, did not attend the meeting and claims that he knew nothing about it. (Bixby Aff. 2 ¶ 7). Instead a business analyst working on the project attended. (Williams Dep. 240-43). Williams then met with James and Nassos to discuss Bixby's workload. (Def. St. ¶ 19). Williams returned the projects that

Nassos had removed to Bixby's workload. After the meeting, Bixby was again responsible for the APS Migrations and Enterprise Release projects. (Def. St. ¶ 19).

On June 11, 2008, Bixby reported his April hospitalization as a Workers' Compensation Injury and requested leave from Williams to fully recover from the injury. (Bixby Dep. Ex. 7). In the alternative, Bixby requested that Williams accommodate his disability by reducing his workload and granting him a disability leave. (Bixby Dep. Ex. 7). Williams told Bixby to "do what he needed to do," but requested that he perform his duties if he was at work and to complete his mid-year review prior to commencing his leave. (Def. St. ¶ 21). Bixby informed Chase that he would take disability leave effective June 16. (Bixby Dep. Ex. 9).

A few weeks later, Bixby's therapist, Dr. Bernie Golden, submitted a letter explaining Bixby's leave request and a completed medical certification. (Golden Dep. Exs. 4,5). Golden explained that he had been treating Bixby for three years and had diagnosed him with a Panic Disorder and Generalized Anxiety Disorder. (Golden Dep. Ex. 4). Dr. Golden further explained that Bixby's anxiety increased with the change in supervisors from Nassos to Williams. (Golden Dep. Ex. 4). Dr. Golden stated that Bixby had reported increased difficulty sleeping and rumination regarding work. (Golden Dep. Ex. 4). Dr. Golden recommended a three-week leave of absence and a decreased workload upon Bixby's return to work. (Golden Dep. Ex. 4). Upon review, Chase granted Bixby's request for FMLA leave from June 16 to July 6. (Def. St. ¶ 23).

Bixby then informed Chase that he believed it had discriminated against him after his April hospitalization. (Bixby Dep. Ex. 12). In short, Bixby believed that Chase retaliated against him after the April hospitalization by changing his supervisor and that Williams had created a hostile work environment by unfairly evaluating Bixby's performance and by refusing to accommodate Bixby's

request for a reduced workload after the hospitalization. (Bixby Dep. Ex. 12). Chase investigated Bixby's complaint and deemed them to be without merit. (Clark Decl.).

Bixby returned to work on July 7, and Williams immediately held his mid-year review. (Def. St. ¶ 26). Williams solicited feedback from Bixby's peers and team members using Chase's internal performance management system. (Williams Decl.). Six of the nine employees who provided feedback suggested that Bixby had room to improve, particularly concerning his ownership of projects. (Williams Decl. Ex. 1). Williams rated Bixby as a "Low Meets" and believed he was trending towards "Needs Improvement." (Bixby Dep. Ex. 13).

Near the end of August, Williams had prepared a written performance warning for Bixby. (Williams Decl. Ex. 2). Williams and James planned to meet with Bixby on August 28. (Def. St. ¶ 28). That day, however, Bixby informed Chase that he was going to work from home because of a medical situation. (Def. St. ¶ 28).

On August 29, Bixby informed Chase that he was requesting a reasonable accommodation, seeking permission to work from home. (Def. St. ¶ 29). Bixby's health care provider, Dr. Laurie Goldman, submitted a letter in support of Bixby's request. (Goldman Dep. Ex. 5). Goldman stated that Bixby suffered from Adjustment Disorder with mixed anxiety and depressed mood, that his workload and current managers are precipitating symptoms of anxiety level, and that in her opinion working from home for 90 days would reduce his symptoms. (Goldman Dep. Ex. 5).

A Unit Coordinator in Chase's Health and Wellness Center, Theresa Tamayao, investigated Bixby's request. (Def. St. ¶ 30). Williams told Tamayao that "the business" would accommodate Bixby working from home one to two days per week, but not five days per week because of Bixby's performance level. (Def. St. ¶ 33). Williams also told Tamayao that Bixby had projects that

required face-to-face interaction with team members. (Def. St. ¶ 33). Bixby informed Tamayao that he could perform all of his duties from home. (Tamayao Dep. 74-85, 92-93).

Chase informed Bixby that it would allow him to work from home 1-2 days per week for 30 days. (Def. St. ¶ 36). Bixby then informed Chase that rather than accept its proposed accommodation, he would request Short Term Disability leave through November 17, 2008. (Def. St. ¶ 37). Dr. Goldman then submitted a medical certification in support of Bixby's request. (Goldman Dep. Ex. 7). Chase approved Bixby's request for paid Short Term Disability Leave. (Def. St. ¶ 38).

Both Drs. Goldman and Golden kept Chase informed about Bixby's progress while he was on leave. In October 2008, Dr. Goldman informed Chase that the degree of impairment had lessened and recommended he return to work in January 2009. (Goldman Dep. Ex. 8). In November 2008, Dr. Golden informed Chase that Bixby would be able to return to work in January 2009 and that his return to work should be gradual, and that his condition might result in episodes of incapacity related to increased work demands. (Golden Dep. Ex. 10). In December 2008, Dr. Goldman informed Chase that she expected Bixby to return to work on January 21, 2009. (Goldman Dep. Ex. 9). In December 2008, Dr. Golden also reported that Bixby was making slow, gradual progress and that he could return to work on January 10, 2009. (Golden Dep. Ex. 11). In addition, Bixby informed Chase that he expected to return in January 2009. (Def. St. ¶ 40).

On January 12, 2009, Bixby requested several accommodations from Chase in expectation of his return to work including, but not limited to: (1) a part-time work schedule for 90 days; (2) no business travel; and (3) the ability to work from home for 90 days. (Def. St. ¶ 43). Chase granted some of Bixby's requests and ignored others. (Def. St. ¶ 49). It further denied his request for no

business travel and work from home. (Def. St. ¶ 49). It granted his request to work a part time schedule for two weeks, but required that he work five hours each day. (Def. St. ¶ 49).

Bixby continued to demand the accommodations he originally requested. (Def. St. ¶ 50). In addition, he proposed a part-time schedule consisting of two eight-hour days. (Def. St. ¶ 50). Chase granted Bixby's request for a part-time schedule, but continued to deny his other requests. (Def. St. ¶ 53). It informed Bixby that unless he returned to work on January 26, 2009, it would process the termination of his employment as a resignation. (Def. St. ¶ 53).

When Bixby did not return to work, Chase contacted both Drs. Goldman and Golden. (Def. St. ¶¶ 54-55). Neither doctor provided any additional information to update their previous recommendations. (Def. St. ¶¶ 54-55). Bixby informed Chase that he did not wish to resign, but did seek an accommodation that was consistent with his medical needs. (Def. St. ¶ 57). Dr. Goldman provided Chase with a letter that Bixby had edited in further support of Bixby's requested accommodations. (Goldman Dep. Exs. 16-17; Bixby Dep. Ex. 48).

Chase requested further information from Dr. Goldman, specifically requesting information about symptoms of his disability that may be triggered in the workplace and reasons why working from home would alleviate such symptoms. (Pendler Dep. Ex. 10). Dr. Goldman responded that working from home "seems to be the only effective means" to avoid triggering symptoms such as "irritability, insomnia, anxiety, poor concentration, feelings of hopelessness and worthlessness, suicidal ideation, and heart palpitations, nausea, diarrhea, shakiness, and shortness of breath." (Goldman Dep. Ex. 19).

A clinical psychologist in Chase's Employee Assistance and Work Like Program, Dr. Paul Pendler, disagreed with Dr. Goldman's recommendation that working from home was a medical

necessity. (Def. St. ¶ 65). Dr. Golden too disagreed with Dr. Goldman's recommendation. (Golden Dep. at 246-49). In particular, Dr. Golden believed that exposure to the office in a gradual way would reduce his anxiety. (Golden Dep. at 222-26, 248-49). Chase refused to grant Bixby's request to work from home for 90 days. Bixby did not return to work, and on March 13, 2009, Chase processed his resignation. (Def. St. ¶ 69).

## II. Standard of Review

Courts must grant a motion for summary judgment when "there is no genuine issue as to any matter fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmoving party must establish that there is a genuine dispute over material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material" fact is any fact that may affect the final adjudication of the case under existing law and if it creates an inference that would a reasonable jury to find in favor of the nonmoving party. *Id.*

The court, however, must evaluate all admissible evidence in a light most favorable to the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003). Nevertheless, to survive summary judgment, the party must present more than speculation and conjecture. *Id.* In other words, the nonmoving party cannot rely on the pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

## III. Analysis

*A.     ADA Failure to Accommodate Claim*

Bixby claims that Chase failed to offer a reasonable accommodation for his disability. The Americans with Disability Act requires employers to offer "reasonable accommodation" to a "qualified individual with a disability" unless such an accommodation would present an "undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). An employer's failure to offer a reasonable accommodation to a qualified individual with a disability constitutes discrimination. 42 U.S.C. § 12112(a); *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1066 (7th Cir. 2008).

The ADA in part defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12111(8)(A). The parties do not dispute whether Bixby's well-documented history of psychological disorders, including Panic Disorder, Generalized Anxiety Disorder, and Adjustment Disorder, constitute a mental impairment. Instead, the parties dispute whether Bixby's impairment "substantially limits" one or more of his major life activities.

The inquiry in this regard is whether "the limitation is substantial or considerable in light of what most people do in their daily lives, and whether the impairment's effect is permanent or long term." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 801 (7th Cir. 2005). To meet this requirement, a plaintiff must be able to demonstrate that during the relevant time period he was prevented or severely restricted from major daily tasks such as walking, eating, sleeping, or sexual reproduction. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195-99, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). A plaintiff must point to specific facts to prove he is substantially limited in a major life activity; conclusory allegations are insufficient. *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006).

Chase first argues that Bixby is not disabled within the meaning of the ADA because his disorders are "short-term psychological responses to life stressors, typically lasting less than six months." Chase finds support for its argument in a footnote that it strips from its context. In *Scheerer*, the plaintiff had argued that he was disabled because of an adjustment disorder. *Scheerer*, 443 F.3d at 920 n.2. The plaintiff in *Scheerer*, however, had not "spell[ed] out precisely how [his] condition results in a substantial limitation in a major life activity, aside from references to sleep disruption." *Id.* As a result, the court looked to the Psychiatric Associations Diagnostic and Statistical Manual of Mental Disorders to define an "Adjustment Disorder," and noted that they are typically (but, pointedly, not always) short-term in duration. *Id.* Thus, the court's holding that the plaintiff had not demonstrated a substantial limitation in a major life activity had less to do with the temporary nature of the adjustment order than it did with the plaintiff's failure to point to specific limitations caused by the Adjustment Disorder. *Id.*

Of course, the facts here are quite different. Far from being temporary or short-term, Bixby had been under the care of Dr. Golden for three years when he requested the accommodation. In addition, Bixby has been diagnosed with additional disorders, that Chase wholly neglects to discuss, including Panic Disorder and Generalized Anxiety Disorder. Most importantly, *Scheerer* does not stand for the proposition, as Chase argues, that an Adjustment Disorder can never render a person disabled within the meaning of the ADA. Rather, it stands for the rather unremarkable proposition that a plaintiff must point to specific facts that demonstrate why a mental impairment substantially limits a major life activity. *Scheerer*, 443 F.3d at 919, 920-21 n.2 (holding that "under the circumstances here" Adjustment Disorder did not render the plaintiff disabled).

Chase also argues that Bixby is not disabled within the meaning of the ADA because his ability to work was limited only "to his particular role at Chase." Chase contends that the only limitation on Bixby's ability to work is his ability to work under Williams. The inability to perform a single, particular job does not constitute a major limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(I); *Burnett v. LFW, Inc.*, 472 F.3d 471, 484 (7th Cir. 2006). Rather, it means that a person cannot perform a class of jobs or a broad range of jobs in various classes as compared to the average person with similar qualifications. 29 C.F.R. § 1630.2(j)(3)(I); *Burnett*, 472 F.3d at 484. If the undisputed evidence indeed demonstrated that the only limitation on Bixby's ability to work was his ability to work under Williams, then Bixby could not survive summary judgment. But Chase takes far too narrow a view of the evidence.

Taken in the light most favorable to Bixby, the evidence demonstrates that Bixby's disorders caused him to be hospitalized as a result of a work-induced panic attack in April 2008. After Bixby was released from the hospital, Bixby requested that he be allowed to work from home because he was unable to handle the stress of the office environment. Bixby then worked from home for approximately one month and then requested short term disability leave. Although Bixby returned to work briefly, he later requested a second short term disability leave because his disorders made him incapable of handling the stress of the office environment. Bixby never returned to work in the office. Taken in th light most favorable to Bixby, a reasonable fact-finder could conclude that Bixby's related disorders caused him to be unable to work in a standard office environment, which would demonstrate that he was unable to perform a broad range of jobs in various classes, without some accommodation, that an average person could perform.

Chase also argues that it is entitled to summary judgment on Bixby's reasonable accommodation claim because it did not deny him a reasonable accommodation. Under this circuit's precedent, accommodations are reasonable when they are: (1) efficacious; and (2) proportional to costs. *Vande Zande v. State of Wisconsin Dept. of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995); *see also Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1068 (7th Cir. 2008). Reasonable accommodations include more than just things that are medically necessary. 42 U.S.C. § 12111(9)(A). Instead, they include modifications or adjustments that enable an employee with a disability to enjoy the equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities. 29 C.F.R. § 1630.2(o). Whether a proposed accommodation is reasonable is typically a fact-specific inquiry, requiring the balancing of each party's needs. *Rauen v. U.S. Tobacco MFG Ltd P'Ship.* 319 F.3d 891, 896 (7th Cir. 2003).

The crux of the parties' dispute rests upon whether working from home was a reasonable accommodation. Chase first argues that allowing Bixby to work from home was not a reasonable accommodation because it was not medically necessary. This argument misses the mark. Whether working from home was "medically necessary" is not the question before the Court. Rather, an accommodation is reasonable if it is "efficacious," meaning that it would effectively address his limitations and enable him to enjoy equal benefits and privileges of employment as non-disabled employees. 29 C.F.R. § 1630.2(o). A simple example makes the distinction clear. A person in a wheel chair might be capable of opening a door, but opening a door while in the wheelchair is a burden on that person who must struggle to open the door and navigate the wheelchair through it. Because the person can still enter the building, it is not "medically necessary" to install an automated door to enable the person to enter the workplace. But because the disabled person must struggle with

the door, he would not enjoy equal benefits and privileges as other employees who can enter and exit the workplace without any such struggle. Thus the question is not whether Bixby had to work from home to get his job done, but rather whether he had to work from home to be free from levels of stress or anxiety not experienced by other employees.

Drs. Pendler and Golden believed not only that Bixby could work in the office, but that working in the office would actually reduce his anxiety because it would force Bixby to confront the triggers that caused the his anxiety. Drs. Pendler and Golden's testimony speaks to whether working from home would have been a necessary accommodation, not an efficacious one. Neither Dr. Pendler nor Dr. Golden discuss whether working from home would allow Bixby to reduce the level of stress he faced. Rather, they opined that Bixby could learn to cope with the triggers that caused his stress by working in the office. Dr. Goldman, on the other hand, offered a different recommendation, concluding that working from home was the only effective way to avoid triggering symptoms related to Bixby's disorders. A jury could conclude from Dr. Goldman's opinion that working from home would have allowed Bixby to enjoy a workplace with the same stress and anxiety as other employees. In that sense, a jury could conclude that working from home would have been an efficacious accommodation.

Chase also argues that the accommodation is not reasonable because it is not proportional to costs. The Seventh Circuit has been reluctant to conclude that working from home is a reasonable accommodation. *See, e.g., Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 547-48 (7th Cir. 2008); *Rauen*, 319 F.3d at 896-97; *Vande Zande*, 44 F.3d at 544-45. That is because most jobs "involve team work under supervision rather than solitary unsupervised work, and team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's

performance." *Vande Zande*, 44 F.3d at 544. While there may be exceptions to this general rule, "it would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home." *Id.* at 545. *Vande Zande*, however, was decided over seventeen years ago, when the internet and technology had not yet made remote access to the job site and its operational systems as feasible as it is today. In fact, *Vande Zande* recognized that advances in communications technology may make working from home more realistic. *Vande Zande*, 44 F.3d at 544. Certainly, *Vande Zande* does not stand for the proposition that working from home accommodations are *per se* unreasonable, and courts must look to the particular facts and circumstances of the case to determine whether such an accommodation is proportional to costs.

In support of its argument that working from home is not an accommodation that is proportional to its costs, Chase points to Bixby's job responsibilities, suggesting that he could not adequately perform his job from home. Chase notes that he directed activities and people on a day-to-day basis, facilitated meetings, worked with IT, and coordinated many pieces on his projects. Chase does not, however, point to any evidence in the record to demonstrate that these job responsibilities could not be performed from home or that Chase's business could not accommodate a full-time work from home scenario for a limited period of time. Instead, the record demonstrates that many meetings were conducted by teleconference and that Bixby could direct activities and people through the use of e-mail. Bixby states that most of his work could be done on a computer, and nothing in the record suggests that there was any difficulty in providing remote access to the systems on which Bixby worked.

More importantly, the record contains evidence that Chase allowed as many as three other Project Managers to work from home on a full-time, permanent basis. (Pl. St. Add'l ¶ 26). Chase

argues that because these employees all lived miles from the nearest Chase office that their situations are not relevant. But that makes little sense. The relevant question regarding whether allowing Bixby to work from home was proportional to costs is whether the job of Project Manager could be performed by an employee working at home full-time. Clearly, Chase believed that the position of a Project Manager *could* be accomplished outside of the office, as it allowed three of its Project Managers to do so on a full-time, permanent basis.

Chase has one final arrow in its quiver. It argues that Bixby in particular was unable to fulfill the responsibilities of a Project Manager from home. In support it points to the evaluation completed by Williams in July 2008. Those evaluations, however, do not speak to the issue of whether Bixby whether Bixby would have been more or less capable of performing his job responsibilities from home. Rather, they speak only to general dissatisfaction with Bixby's performance. Chase points to nothing in the record to demonstrate that it would not be able to supervise or review Bixby's performance remotely. Nor does it point to any evidence in the record that Bixby would have performed more poorly if he worked at home than he would have if he worked in the office.

Moreover, there is a genuine issue of fact regarding whether the negative evaluations were pretextual. Satisfactory job evaluations that suddenly change allow an inference of discriminatory intent. *Phelps v. St. Catherine's Hosp.*, 908 F.2d 975, 1990 WL 105584, *2 (7th Cir. Jul. 25, 1990). Until May 2008, Bixby had positive evaluations, but when Williams became his supervisor those evaluations suddenly changed. Immediately after becoming Bixby's supervisor, Williams began soliciting feedback on Bixby (and, apparently, no other Project Manager). Due to Bixby's first disability leave, Williams had been Bixby's supervisor for slightly less than four weeks prior to forming an opinion about Bixby's performance. Given Williams's decision to immediately solicit

19

feedback about Bixby and no other Project Manager, the extremely short period of time that Williams actually supervised Bixby, and the sudden change in Bixby's evaluations a reasonable jury could determine that Chase's belief that Bixby was not meeting its expectations was not legitimate.

A reasonable jury could find that because Chase allowed other Project Managers to work from home on a full-time, permanent basis that allowing Bixby to work from home for a period of time was a reasonable accommodation. The Court DENIES Chase's Motion for Summary Judgment on Bixby's ADA Failure to Accommodate Claim.

Bixby also moves for summary judgment on his failure to accommodate claim. With regard to Bixby's motion, the Court must view the evidence in the light most favorable to Chase. When assessing the evidence in the light most favorable to Chase, a reasonable jury could conclude that Bixby was not substantially limited in the major life activity of working. The evidence in the record demonstrates that even after Bixby had taken two short term disability leaves neither of his treating professionals believed that he would be required to work from home for more than 90 days. Moreover, one of the two treating professionals believed that Bixby could return to an office environment immediately. Most importantly, both Drs. Goldman and Golden opined that Bixby's anxiety had increased with the change in supervisors. (Golden Dep. Ex. 4; Goldman Dep. Ex. 5). In other words, a reasonable jury could conclude that Bixby was limited only in his ability to work for Williams and not generally in his ability to work.

Bixby further argues that his condition substantially limited many other major life activities, such as brain functioning and sleeping. However, he points only to very generalized facts. For example, the record demonstrates only that Bixby would wake up thinking about work after only three or four hours of sleep. (Pl. St. Add'l ¶ 5). However, Bixby does not state how frequently the

insomnia occurs. Even if he did, a "hard night's sleep" or "intermittent sleep" is insufficient to demonstrate that sleeping is substantially limited. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784 (7th Cir. 2007) (holding that inability to sleep more than four hours a night not a substantial limitation); *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 757 (7th Cir. 2006) (same). The evidence states generally that his insomnia "interfered with his daily functioning in social settings" but Bixby points to no specific details in the record of how his insomnia interfered with his daily functioning. (Pl. St. Add'l ¶ 5). Similarly, the evidence points only to general statements regarding Bixby's "brain functioning," suggesting that he sometimes experiences sadness, was afraid to walk on his balcony, and had suicidal ideation. The evidence provides no indication how frequent or pervasive such symptoms are. (Pl. St. Add'l ¶ 4).

As noted earlier, a plaintiff must point to specific facts, and not just conclusory assertions, to demonstrate a substantial limitation. *Scheerer*, 443 F.3d at 919. While Bixby may be able to adduce such specific facts at trial, he has not done so here and the Court cannot conclude that the undisputed evidence, taken in the light most favorable to Chase, demonstrates that Bixby's condition substantially limited him in any major life activity. Because a reasonable jury could conclude that Bixby was not substantially limited in a major life activity, it could conclude that he was not disabled within the meaning of the ADA and thus not entitled to any accommodation. The Court therefore DENIES Bixby's Motion for Partial Summary Judgment.

### B. ADA Retaliation Claim

The ADA prohibits employers from retaliating against employees who assert their rights under the Act to be free from discrimination. 42 U.S.C. § 12203(a). Even if initial claims of discrimination lack merit, employers may not retaliate against employees for voicing concerns about

discrimination. *Squib*, 497 F.3d at 786. An employee may prove a retaliation claim using either the direct or the indirect method. *Dickerson v. Bd. of Trustees of Cmty Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Under the direct method, an employee must demonstrate that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the two. *Id.* To establish a case of retaliation using the indirect method, an employee must demonstrate that: (1) he engaged in statutorily protected activity; (2) he was performing his job satisfactorily; and (3) he was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Id.* at 601-02.

Bixby's claim survives under the direct method. Bixby first engaged in protected activity in April 2008, when he requested an accommodation for his disability. Bixby later complained to Chase about these changes made to his job assignment by Williams, alleging that it had begun discriminating against him because of his request for an accommodation.

Bixby also suffered an adverse employment action. Less than two weeks after Bixby complained about Williams's actions, Williams gave Bixby a negative performance review. Although negative evaluations are not considered adverse employment actions within the context of discrimination claims, they can be adverse employment actions within the context of retaliation claims. *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 741 (7th Cir. 2011). That is because negative evaluations, particularly those that are unfair or unjust like Bixby argues here, can serve to have a chilling effect on an employee's decision whether to engage in statutorily protected activity. *Id.*

Finally, Bixby can demonstrate a causal connection between his statutorily protected activity and the adverse employment action. Ordinarily, mere temporal proximity is not sufficient to create a causal connection. *Mobley*, 531 F.3d at 549. However, where the retaliatory act occurs on the heels of protected activity — mere days — it can support a reasonable inference of discrimination. *McClendon v. Indiana Sugars*, 108 F.3d 789, 796 (7th Cir. 1996); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). Here, Chases's actions occurred on the heels of Bixby's protected activity.

A few days after Bixby requested an accommodation, Chase replaced Bixby's supervisor with Williams. Within eight days, Williams: (1) reassigned him a project that the previous supervisor had temporarily removed; (2) sent ten persons with whom Bixby had worked a targeted, single-question survey about Bixby's (and no one else's) performance; (3) compiled a list of performance criticisms even though during Bixby's most recent evaluation he had been rated as exceeds expectations; and (4) reorganized Bixby's (and no one else's) job position to take away all of Bixby's "direct reports" even though the entire OnBoarding Department had been reorganized less than one month earlier.

And when Bixby complained about Williams's actions, he received a negative performance review less than two weeks later. During the first half of 2008, Bixby had completed three software release projects. (Bixby Dep. Ex. 13). Williams sent an e-mail to the team that completed one of the projects, including Bixby, in which he thanked them for their work in making the project successful. (Nassos Dep. Ex. 21). And yet, in Bixby's mid-year review, Williams criticizes Bixby's performance on that same project and suggests he "needs improvement" in the objective of delivering software release projects (Bixby Dep. Ex. 13). At the same time, another Project

23

Manager, Diane Wentworth, completed only one software release project and Williams believed she "exceeds expectations." (Williams Dep. Ex. 16). In addition, Wentworth one software release project encountered significant post-release defects and Williams still rated Wentworth as "low meets expectations." (Williams Dep. Ex. 16).

There is more than just a temporal connection, however. Williams's actions could be fairly inferred as singling Bixby out. Immediately after assuming the position as Bixby's supervisor, Williams submitted very narrowly tailored requests for feedback about Bixby and then used the responses to justify a negative performance evaluation. Williams also reorganized Bixby's job responsibilities immediately after becoming his supervisor, even though Williams's own supervisor had reorganized the entire department just a month earlier. Finally, Williams "undid" some of the accommodations that Bixby's prior supervisor had provided by reassigning him to certain projects. Chase may have a non-retaliatory explanation for Williams's decision to target Bixby immediately after becoming his supervisor, and a jury very well could believe Williams's explanation. But a reasonable fact-finder could just as well believe that Williams did not believe that Bixby needed an accommodation and began retaliating against him for requesting one.

The Court DENIES Chase's Motion for Summary Judgment on Bixby's ADA retaliation claims.[4]

*C. ADA Discrimination Claim*

---

[4] To the extent that Bixby claims that Chase retaliated against him by denying his requests for accommodations, the Court believes those claims are properly cast as failure to accommodate claims. If Bixby was not entitled to an accommodation, then Chase's failure to accommodate him cannot have been retaliatory. On the other had, if Bixby was entitled to an accommodation, Chase's failure to offer it establishes a claim of discrimination on the grounds that it did not offer a reasonable accommodation.

Bixby's ADA Discrimination Claim, to the extent that it is separate from his failure to accommodate claim, merits little discussion. It is not clear whether Bixby claims that Chase created a hostile working environment or whether he alleges more discrete acts of discrimination. Bixby alleges that Williams made derogatory comments to him, calling him "worthless" or "the king of delegation." Bixby offers no evidence about the frequency of such comments. Nor does Bixby offer any explanation of the connection between Williams's derogatory comments and his disability. Quite simply, they are not sufficient to create a hostile work environment. *Atanus v. Perry*, 520 F.3d 662, 676 n.8 (7th Cir. 2008) (explaining that to defeat summary judgment in hostile work environment claim, an employee must demonstrate that the workplace is permeated with discriminatory conduct that is sufficiently severe or pervasive to alter the conditions of his employment).

Bixby also complains of the negative performance review and reorganization of his job duties. In the context of discrimination claims, adverse employment actions must be accompanied by a tangible job consequence. *De La Rama v. Ill. Dept. of Human Serv.*, 541 F.3d 681, 686 (7th Cir. 2008). Bixby points to no tangible job consequences, such as a loss in pay or loss of opportunity for advancement, that accompanied either the performance evaluation or reorganization. The Court therefore GRANTS Chase's Motion for Summary Judgment on Bixby's ADA Discrimination Claims (excepting Bixby's failure to accommodate claim).

D.    *IHRA Claims*

The Illinois Human Rights Acts forbids discrimination in the workplace. 775 ILCS § 5/1-101 *et seq.* Among other things, the IHRA protects requires employers to offer reasonable accommodations to employees with disabilities and forbids employers from retaliating against

employees who protest discrimination under the Act. 775 ILCS § 5/2-102; 775 ILCS § 6-101; *Owens v. Dept. of Human Rights*, 403 Ill. App. 3d 893, 916, 936 N.E.2d 623 (Ill. App. Ct. 2010); *Owens v. Dept. of Human Rights*, 356 Ill. App. 3d 46, 53-54, 826 N.E.d2d 539 (Ill. App. Ct. 2005); 56 Ill. Admin. Code § 2500.40. The Illinois Supreme Court has adopted the framework for evaluating discrimination claims set forth in *McDonnell Douglas Corp. v. Green. Zadereka v. Ill. Human Rights Comm'n*, 131 Ill.2d 172, 178-79, 545 N.E.2d 684 (Ill. 1989).

Chase initially argues that Bixby does not fall within the category of persons protected by the statute because his condition is not "unrelated" to his ability to perform his job. The IHRA defines a handicap as a "determinable physical or mental characteristic . . . [that is] unrelated to the person's ability to perform the duties of a particular job or position." 775 ILCS § 5/1-103(I)(I). Of course, whether Bixby had a "handicap" as defined by the IHRA considers his condition *after* the employer has made any required reasonable accommodations. 56 Ill. Admin. Code § 2500.40; *Ill. Bell Telephone Co. v. Human Rights Comm'n*, 190 Ill. App. 3d 1036, 1050, 547 N.E.2d 499 (Ill. App. Ct. 1989). Chase's argument that Bixby is not protected by the IHRA is wrong.

Chase next argues that it need not provide Bixby with an accommodation because the accommodation he sought was merely to continue performing his job at an unacceptable level. This argument takes the evidence in the light most favorable to Chase and not the light most favorable to Bixby. While a reasonable jury could conclude that Bixby was not performing adequately prior to his request for an accommodation and simply requested an accommodation as a cover for his poor performance, such a conclusion is not foregone. Although it is Bixby's burden to demonstrate that the accommodation was necessary for adequate job performance, *see Illinois Bell*, 190 Ill. App. 3d at 1050, there is a genuine issue of material fact regarding whether Bixby can meet this burden. As

noted earlier, a reasonable jury could conclude that Bixby's condition prevented him from handling the stress of an office environment on a daily basis and that if Chase had allowed him to work from home for a period of time he would have been able to perform his job adequately. To the extent that Chase offered this accommodation to employees who were not disabled but who lived far from a Chase office, a reasonable jury could determine that it discriminated against Bixby by failing to offer him an accommodation.

The Court DENIES Chase's Motion for Summary Judgment on Bixby's IHRA accommodation and retaliation claims. The Court GRANTS Chase's Motion for Summary Judgment on Bixby's IHRA discrimination claim on the grounds that, other than failing to accommodate him, Bixby has not shown he suffered an adverse employment action.

IT IS SO ORDERED.

_____3/8/13_____
Dated

*Wm. J. Hibbler*
Hon. William J. Hibbler
U.S. District Court